Proceed to the next case on the calendar, which is Figueroa-Garcia v. Schmitt. Counsel will come forward, please. Counsel. Fernando Ochoa, on behalf of Ms. Figueroa-Paz. Good morning. Good morning, and welcome to Phoenix, Arizona. Well, you can welcome the other two. I live here. The Ms. Figueroa-Paz's position is, I think, very clear and very, you know, very precise in the way we've raised the issues. Basically, the father allegedly, because it's not been proven in this case, there's never been any evidence admitted in Ms. Figueroa-Paz's case about the father's case. But the government alleges that the father went to an immigration hearing in which he was not able to rebut the presumption of alienage. The father, we don't know if the father has applied for a passport or he has obtained a passport. And we don't know if the father intends at some point to bring in more evidence, reopen the case, or apply to the U.S. District Court for a certificate of citizenship. I had thought the immigration judge had determined that the father had obtained entry through fraud. Is that right or wrong? That's the – I think that's incorrect. I think the way it was – What was the basis – let me finish my question. What was the basis for the immigration judge's ruling with respect to the father? There was a birth certificate proffered by the government that submitted an evidence against the father showing that he had been born in Mexico. At that point, then the father is required to rebut the presumption. He presented a birth certificate issued by California that had been obtained on the basis of a baptismal certificate out of Idaho. The government then presented evidence that that birth certificate was of dubious quality. And then the judge, with those facts, said, I don't think that you've rebutted the presumption of alienation and found him to be deportable. Isn't the net effect of that a determination for the purpose of this appeal that the father improperly obtained entry originally? No. Because the father could have entered the United States as a lawful permanent resident or, in fact, the father, if he entered as a U.S. citizen. And he may – Well, if he had determined that he's not. No, it's not been determined. That's a very important issue to understand. It has not been determined. You see – Let me just stop there. If we read this interlocutory order, the interlocutory order says that on January 23, 1996, the father was found to be native and citizen of Mexico, found to have obtained a birth certificate by fraud, and he returned to Mexico. Why isn't that a binding finding? Because the judge never finds it to be fraud. If you read the transcript, and I've cited the transcript, the entire transcript that is proffered as an exhibit, not as evidence because it's never been admitted in evidence, but the entire transcript of the father's proceeding. They don't talk about fraud. They talk about the fact that the father's unable to rebut the presumption, and he's concerned about the quality of the documents and the quality of the evidence. Because it's important to understand that under immigration law, the immigration judge cannot find you to be a citizen. There is not an immigration judge that can issue a certificate of citizenship because – An immigration judge could determine that somebody is not removable because that person is a citizen. Yes. And that kind of renders you stateless because the way it works is that, and I know from personal practice because I have clients in this situation, where the government will not issue a certificate of citizenship, will not give them Social Security documents, will not even let them get a driver's license, but they're not removable. So where are they? They're stateless. They're here. They're here, but they're not citizens of the United States. They don't have a single document to show that they are citizens. It's kind of like the reverse of the criminal proceeding. You know, when a criminal proceeding, a judgment of acquittal, doesn't mean that you're innocent. It just means that the government was not able to prove the case. In Mr. Figueroa's father's case, he was accused of a false claim for citizenship, and he was not convicted. He was, in fact, acquitted. Now, because he was acquitted, does that make him a citizen? The immigration judge says you can't rebut the presumption. The magistrate judge found that an immigration judge had determined that he was not a citizen and, therefore, removable. And reading from the report, this decision was based upon the discovery of false documents, including a forged baptismal certificate, which your father had used to claim citizenship. Well, that's what we're appealing. The magistrate judge's findings are wrong, because the judge never found that he was, you know, the immigration judge can't find. I mean, that's a trick here. The immigration judge cannot define that you're a citizen or not. You can find that he's not a citizen. Well, you have to if you're going to determine a removability, because if you're a citizen, you're not removed. But it's not a final adjudication on the issue of citizenship. And that's important. It's not a final adjudication. You can still go to district court. It's not an adjudication of an application for citizenship, but it is a finding by the IJ that somebody is not a citizen. But it's a citizen, you can't kick him out. But you can still come back and reopen. Newly discovered evidence, you can come back. There's all kinds of things. That's a related question. That is, where is your client now? In the courtroom. Now, I'm a little confused procedurally. And it's probably because we get so many of these. I assume the first time around, it's probably the usual pattern. But I understand that the BIA affirmed without opinion with regard to this case or this person a couple years ago. Was that a petition to our court? Or what's happened with regard to the removal of your client? Well, what happened was that the BIA said she's a lawful permanent resident of seven years. She can apply for 212c relief, and we are remanding to have a hearing on 212c. And that's where you are now? And that's where we are now. That's where you go to district court. So, no, what happens is we go to the immigration judge, and the immigration reopens the case without filing the motion to reopen. They present new charges on basis of old evidence that was available previously. We told the court, you know, this is barred. You can't raise new charges. And the court allowed it. So what happened to the 212c effort? They never let us apply. You never were permitted to apply. No. We were pretermitted, and we were not allowed to apply. And so procedurally, we're kind of like, we need to get back into the immigration court so we can get rid of this reopening effort by the government. Because if they had filed a motion to reopen, they could not have done it. If they wanted to file new charges, they would have been barred because a claim would have been precluded under the law of the Ninth Circuit, under the law of the Board of Immigration Appeals. They're not allowed to bring in new charges that were available and knowing at the time. The complaint against the father was issued in 93. So by the time we're in court, we're in 95. By the time we get back from the Board of Immigration Appeals, we're in 2000, 2001. So years have gone by, and they never raised the issue. Now they want to raise the issue. Much later, after this, BIA had already ruled, you're a lawful permanent resident of seven years. We remand so that you can use your 212C. They didn't say, we remand for further proceedings. They didn't say, we remand so the government can reopen on anything they want and they can look for new charges. I mean, it's, you know, it's a classic case of somebody where there's already been a partial summary judgment. You go back, and now they want to raise a whole new claim. If this is a hypothetical question, but if your client in between the two procedures had been convicted of an aggravated felony, under your theory, would the government be precluded from using that as the basis to either deny 212 relief or to seek removal? That would have been newly discovered evidence. You're saying between 1995 and when we came back in 2001? Or at any time. Let's say the conviction existed. The government didn't discover it until the case was coming back from the BIA to the IJ. Under your theory, would they be precluded from raising that? I don't see how they would not have discovered it, but in this hypothetical world where anything is possible. The government makes mistakes from time to time. Oh, yeah. That's why we're here. You're down to under a minute. Do you want to save a little time for rebuttal? Yes, if I may. Okay. Thank you, counsel. We'll hear from the government at this time. Ms. Parsons. Good morning, Your Honor. Cynthia Parsons for the Respondent. The issue just raised by Petitioner's counsel regarding the motion to reopen is a red herring. If I may just re-familiarize the Court with the sequence of events, there was no motion to reopen ever filed. When the BIA remanded the case to the immigration judge, and I would refer you to page 11, there was no final order. In immigration proceedings, orders are not final until the BIA has either dismissed the appeal or granted the appeal if an appeal is filed. Give us the sequence, not with regard to the exact date, but just when they occurred. Okay. Very well. And the events are father determined not to be a citizen, removed or deported, and then the proceedings involving the daughter. Can you give us that sequence? Yes. If I may, I would have to go back to just a little before. Sure. Sure. In 1989, the Petitioner was returning to the United States, was caught, convicted, and placed in exclusion proceedings. This individual that's before us. This individual that is at issue in this case, yes. In 1993, she was ordered, removed in absentia, later again returned to the United States, and reopened her case based on lack of notice of the absentia order. She was able to do that. She was able to do that, yes. She was specifically advised she could do that, and she did. Okay. The case was reopened for lack of notice of the hearing. On August 9, 1994, the Petitioner applied for a 212C waiver. On September 1995, she was found excludable and was precluded from applying for immigration relief, or from 212C waiver. That was appealed to the BIA. The BIA remanded the case on August 18, 1997, noting at that time there was no final order. In the meantime, the government had obtained some information that indicated that Petitioner's father, who had filed the I-130 on her behalf, may not have been a United States citizen as claimed on the I-130. They undertook an investigation. This started in 1990. It concluded for he was placed in proceedings in 1993. We did have independent proceedings going on, one for the father, one for the Petitioner. His case charged him with not, you know, having United States citizenship, being an alien. That was fully litigated. In 1996, in fact, I believe it was December 1996, February 1996, excuse me, January 1996, the IJ issued the order in Petitioner's father's case finding that he was, in fact, an alien. And contrary to what Mr. Gaiola says, immigration judges do on a daily basis find alienage. That is one of the things they are charged with doing. He was found to be an alien and, therefore, removable from the United States. Can you stop there? Yeah. I think you have the same question I do. Because that's the point at which I understood Mr. Gaiola to say he may have been determined not to be a citizen but that there was not a determination of fraud as to the father. Would you clear that up? Yes. In his — if you look at the immigration judge's decision, which is lengthy and detailed, and it appears at ER 361 through 370, and this is the only — this is the thing that the IJ in Petitioner's case, that is, Irma's case, that they relied on was the decision of the IJ in Petitioner's father's case, Ramon. If you look at that order, it goes into great detail about the — first they have the birth certificate. The birth certificate was found to be contradicted by a Mexican birth certificate. They have an I-94 boarded crossing card. All through this, they go through in detail about all the problems with the evidence being produced by the Petitioner, Mr. Ramon Figueroa, saying that it constituted fraud, saying that it constituted — or whether you want to call it questionable documents. You know, but there's a difference because the law is written in terms of the difference. I guess the question on that IJ decision is, was there a finding of fraud? I know it's carried over later in the interlocutory order, but in that decision in 1996, apart from some discussion about questionable documents, is there a finding of fraud, and what page do we look to so we can kind of trace it forward? The word fraud is not used. However, it was more than just a case of a few questionable documents. It was that every document presented, not to mention also testimony, rendered his citizenship questionable. And then the question I have, and I don't know the answer to this, but if fraud wasn't used and fraud wasn't found, if we're then trying to figure out what's res judicata or collateral estoppel that flows down to the child, we certainly could say, well, she has a father who was unable to establish his U.S. citizenship. That's clear. But do we impute to her fraud, which is what's been done here, if there's no finding of fraud? The case that we're actually talking about two separate issues here. One would be the imputation issue, which is brought up in the Seneca case. A separate issue would be res judicata. Let me address the imputation issue first. In Seneca, the Court found that the fact of knowledge could be imputed as well as fraud, and that the knowledge that was in fact imputed in that case to minor children was that a father who was now deceased had entered the United States claiming to be, have a particular status, when in fact he did not. He had fraudulently claimed that status. He died. The mother then came in and tried to immigrate her children. She was apparently aware, either actually aware or with reasonable diligence and this is language actually used in Seneca, with reasonable diligence could have discovered the fact that he did not have that status. And then not only she, but her children entered the fraud at the, excuse me, the it was discovered that the father had not had the lawful status, and they were placed in proceedings. The children claim a waiver. The mother claims a waiver. The Seneca case says no. The mother, the knowledge is imputed to the children, and the knowledge is that of the parent. It is the parent, the father's knowledge. He knew he could not confer those benefits. That knowledge is imputed to the children, in this case minor children. The mother there knew. The mother knew also. But I think that's a critical difference or potential difference, because the mother is the one at that time who is associated in the same case with the minor children. And the Court says clearly in Seneca that the mother admitted that she knew that her husband had lied. In Seneca, they also acknowledge you don't have to have actual knowledge. You can also have constructive knowledge. They didn't use the word constructive knowledge. They used language that the knowledge that you of facts you could have with reasonable diligence have obtained. In this case, both Irma, the Petitioner in this case, and her father, Ramon, were in proceedings simultaneously. They were represented by the same counsel. There was considerable evidence being presented, and this all happened before the additional charges were filed in Irma's case. We can figure out from Seneca whether it's, you know, different, the same, or at least applicable. But does the decision of the district court here rely on the fact that her father fraudulently obtained his citizenship? The district court order does use the term fraud. However, this Court can affirm the decision of the district court on any basis found in the record. And the record shows that knowledge was present, knowledge that was either actual or could have reasonably been discovered with due diligence, and therefore, that could have been imputed. The point is that as between imputation versus res judicata, if some kind of fraud is, or knowledge of fraud is required, do you think you have an easier case with imputation or with res judicata? Actually, the district court order is correct under either theory you look at. That's not, that doesn't answer my question. I'm sorry. In terms of the proof vis-à-vis the government's case, do you have an easier case under imputation or res judicata, given the requirements of each legal standard? It is the position of the government that although we could win under both theories, that res judicata, I believe, actually might be stronger in our favor. And that's because the fact of the final decision regarding Petitioner's father's alienage was established in 1996. That was the final order of the Board of Immigration Appeals. He withdrew his appeal. That rendered the IJ's decision final on all issues, including that one. The — And in that 1996 order, was it a finding that he couldn't establish his citizenship or that he had fraudulently attempted to procure the indicia of citizenship? It's actually both, that he couldn't rebut the implication of alienage, and the reason he couldn't is because all of the evidence he proffered had questionable authenticity. Now, whether you want to collectively call all of that fraud or whether you want to call it questionable authenticity, the effect is the same. He was found to be in a final order to be an alien. And that final order occurred while Petitioner's case was still open. At the time in 1996 when this was decided, when Irma's father's decision was final, her case was open. The BIA recognized when it remanded the case that there was no final order. I'm unaware of any statute or regulation, even back under the old law, that precludes the Attorney General from amending or adding charges during an open case. Therefore, once that alienage was established with finality, they had not only the right but probably an obligation to amend those charges, because at that point it is decided with finality that the status upon which Irma Figueroa's lawful residence was based was not there. She was never lawfully admitted because her father was not a United States citizen or was an alien and could not have conferred the lawful status on her. And therefore, when they amended the charges, they did so in an open case based on a final decision by the BIA. So let me ask one last question. If that were the case, if that's the finding that it takes is simply that he didn't have the ability to confer the lineage for purposes of citizenship, would you need a finding of fraud at all? No. All you need is a determination that he was not appropriately determined to be a citizen. A final finding of alienage shows that he did not have the status as a two that was prerequisite for her obtaining her lawful permanent residence. Well, that's what I thought. So that's why I couldn't figure out why everything was focused on the fraud. And maybe is there, because all the briefing, everything's talked about the underlying fraud and the findings, and you've now presented what is, if correct, a very clear line between A and B. I believe that may have been because the district court did use the term fraud, and it was used by the BIA. But as we said, whether it's fraud, whether it's an imputation of knowledge of unlawful status, or whether it's raised judicata, any way you look at it, the order of the district court, because if correct, Irma Figueroa never was lawfully admitted to the United States. Let me make sure I understand. I'm essentially repeating the question I think you just heard, but I also run all this, and fraud permeates all the discussion. Is it the case that it does not matter on either her father's level or her level of knowledge that her father's purported citizenship was? Let me start this over again. You can be a citizen. You can be not a citizen. You might not know, because none of us really know where we were born. And so it could be argued that her father thought he was a citizen and hence was not, in fact, entitled to citizenship because he was not born within the United States. And then you go a level further as to whether or not she knew that he was or not a citizen and whether or not that citizenship status was fraudulent. The question I'm ultimately trying to pose to you, can you pull the fraudulent element out of it altogether? If it was factually the case that he was not a citizen because he was not born in the United States, does that end it? And it does not matter whether or not he knew or she knew that the citizenship status that he asserted was fraudulent. I may have to parse out the answer a little bit. I don't believe a finding of fraud is necessary in this case, maybe in other cases, but not in this case, to find that Irma was not lawfully admitted, because the immigration judge in a final order in her father's case found that he was an alien. I don't necessarily think it was necessary that that decision be founded on fraud, only that he was not an alien. Now, going to the knowledge aspect of it, first I would contest whether or not there's no evidence that Irma's father suspected he was not an alien. If you look at the immigration judge's decision — I understand that. Okay. But I'm trying to say, does it matter at all? What I thought I just heard in answer to Judge McEwen's question was a statement that Mastry said it doesn't matter, because if he's not a citizen, he could never confer the lawful permanent resident status in the first place. And so even if he fully believed he was a citizen and turned out to be honestly incorrect, her status becomes invalid because he didn't have the power to confer it in the first place. The government would agree with that statement, yes, that someone who does not have the status that is required to confer derivative status on a spouse, child, or other relative, that spouse, child, or other relative does not lawfully have that status. And what's your best case for that? There are several. I didn't cite any particular for that proposition, but there are — I don't have a case specific, but there are numerous cases. It sounds like it's kind of become important. It's not in your brief at all? Well, I have cases dealing with that one cannot confer status by fraud or if one doesn't have the lawful status in the first place. Well, for the purpose of this rather extended discussion we've engaged in now, which has taken you way over your time, and I'm going to give some of that back to your opponent, we've taken fraud out of the equation. It sounds like the government's position, one of its positions now is if the father wasn't properly admitted, the daughter could not have achieved entry properly, whether he knew he was committing fraud or not, whether he had an honest, good-faith belief or not, if he came in and he shouldn't have and was not entitled to, she shouldn't have. That's the government's position, isn't it? That is one of the positions, yes. Okay. We've taken you way over your time. Thank you for your argument, Mr. Cadwell. Let's put six minutes on the clock. You don't have to use it all, but I'm giving you some extra time because she had a little extra time. Thank you. Why don't we start with the legal proposition that we've just been batting around? Okay. And the charge? Because Judge Zastrow did find that the father did, and I'm quoting, did not possess any valid entry documents at the time of his entry. That's correct, isn't it? That is correct. Okay. I mean, the quotation. And the government's taken the position that that means the daughter couldn't have come in, fraud or not. What's your position on that? The deportability charge, and that's at the excerpt of Record 305, is specifically that any alien who, by fraud or willfully misrepresenting a material fact, seeks to procure or has sought to procure or has procured a visa, other documentation, or entry into the United States or other benefit under this Act is excludable. So the charge against Itama Fioroi is specifically fraud. So you can't get out of a fraud. So let me just ask you as a practical matter, because this whole thing has shifted, which is why I asked Ms. Parsons this question, do you need, as I read the immigration statute, you might not need fraud. But now you raise an issue with respect to this charge. If this were granted and deportability were not available because the charges don't match up, would your client still be deportable on another ground, and that is not have status to confer, whether by fraud or otherwise? Yeah. I think the theoretical is if this proceeding were terminated and new charges would be filed alleging that you don't have documentation because your father didn't have documentation. Didn't either, right. Would she be deportable just sort of on a clean line between no documentation of father, derivative to child, unfortunate result? Yes and no. Yes, they would be able to charge. You know, in an abstract sense, yes. But in the facts and the procedural history of this case, no, because the issue is precluded. At the time that you charge someone, you must charge them with everything that you know at the time as a basis for removability. You can't charge somebody and, you know, you don't get all the room. Every time you go on the merry-go-round and you try at the brass ring. You only you file your case and you put all of the basis for removability at the time that you have reason to know. So we're talking about. What's your authority for the proposition that you've just articulated? I'm trying to remember. I think it's Johnson v. INS, but I don't have the citation off the top of my head. Your argument, your point, your theory is that the government, that it's like a criminal proceeding. The government has to bring everything it knows, every potential grounds for removability, and if it doesn't articulate them all, it can't come back. That is correct. There's a case in which an individual is a citizen, makes a claim to citizenship. The judge finds him to be a citizen. In fact, they give him a certificate of citizenship and a passport. Two or three years later, the government comes back and refiles against them and the government and the court, the Ninth Circuit specifically said, you can't do it. You're precluded from doing that because you have to bring the charges at the time. And that's what the case is here. See, we're in court in 95. The order to show cause against the father is filed in 93. So the government already knew. As far as 1990, and I cite the specific pages on the excerpt of record in my, in my reply brief, which I put down the sequence of events. In 1990, they get the Mexican birth certificate. They start the investigation against Ramon Figueroa Paz, Ramon Figueroa. Then in 1993, after they failed in the criminal trial to convict him for false claim to citizenship, then they file the order to show cause in immigration proceedings. So that by 1995, or 1995, they have an order against Mr. Figueroa Paz. But in 1995, Irma Figueroa, the daughter, is in proceedings, and they make no allegation that she's not a lawful permanent resident. Judge Jastrow finds that she's a lawful permanent resident. The government doesn't appeal that. The Board of Immigration, based on Judge Jastrow's finding, I'm sure, say she is a lawful permanent resident of 7 years. She is statutorily eligible to apply for 212c relief. And they specifically remand, and I quote, the applicant herein is in exclusion proceedings and, therefore, is not an ineligible for action under 212c relief. Right. Their argument, as I understand it, is there's no final order at that point. Things are still in flux. Well, there is. There's not a final order of removability, but there clearly is a partial judgment. I mean, the Court has made a determination on the facts of the case, on all the evidence presented in the case, and the Court has ruled. And the Court, when they remand, they don't give a blanket remand. And I know that the Court of Appeals sends cases back all the time saying we're remanding for sentencing. We're not remanding so that you can go ahead and determine the issue of guilt again. If we remand for sentencing, that doesn't mean you can amend the indictment and come in with new charges. The remand is very specific. She is thus eligible to apply for Section 212c relief, and the record will be remanded to give her a hearing on the merits of her application. I think we understand. That's all she wants. I think we understand your argument. We thank both counsel for their arguments, and the case just argued will be submitted for decision. It's
judges: Hawkins, McKeown, Clifton